1

2

3

4

5

6 UNITED STATES DISTRICT COURT

7 DISTRICT OF NEVADA

8 * * *

|   |   |   |
|---|---|---|
| 9 | ADOBE SYSTEMS INCORPORATED, | ) |
| 10 | Plaintiff, | ) 2:10-CV-00422-LRH-GWF |
| 11 | v. | ) ORDER |
| 12 | JOSHUA CHRISTENSON, an individual and d/b/a www.softwaresurplus.com; SOFTWARE | ) |
| 13 | SURPLUS INC.; and Does 1-10, inclusive, | ) |
| 14 | Defendants. | ) |
| 15 | AND RELATED CLAIMS. | ) |
| 16 |   |   |

17        This matter is before the court on cross-motions for summary adjudication and summary

18 judgment and a related motion to strike.

19        First, Plaintiff and Counter-Defendant Adobe Systems Incorporated ("Adobe") and Third-

20 Party Defendant Software Publishers Association d/b/a Software Information Industry Association

21 ("SIIA") filed a Motion for Partial Summary Judgment on Plaintiff's Claims and for Summary

22 Judgment on Defendants' Counterclaims and Third-Party Claims (#87[1]).  Defendants Joshua

23 Christenson and Software Surplus, Inc. (collectively, "Defendants") filed an opposition (#113), and

24 Adobe and SIIA replied (#129).

25

26

_____

[1]Refers to the court's docket entry number.

1    Second, Defendants filed a Motion for Summary Judgment (#88) on Plaintiff's claims.

2    Adobe filed an opposition (#98), and Defendants replied (#124).

3    Finally, Defendants filed a Motion to Strike Precluded Documents and Related Factual

4    Assertions and Argument (#150). Adobe and SIIA filed a joint opposition (#151), and Defendants

5    replied (#153).

6    **I.    Facts and Procedural History**

7    This is an action for copyright and trademark infringement involving resales of so-called

8    "grey market" computer software. Plaintiff Adobe Systems Incorporated is a prominent developer

9    and distributor of computer software, including such titles as *Acrobat*, *Creative Suite*,

10   *Dreamweaver*, *Flash*, *Illustrator*, *PageMaker*, *Photoshop*, and *Shockwave.* (Complaint (#32-2),

11   ¶ 8.) Adobe alleges that it owns exclusive rights under the Copyright Act to reproduce and

12   distribute copies of its software in the United States. (*Id.*) Adobe further alleges that the software

13   products it manufactures and sells bear registered trademarks, including ADOBE, ACROBAT,

14   CREATIVE SUITE, DREAMWEAVER, FLASH, ILLUSTRATOR, MACROMEDIA,

15   PAGEMAKER, PHOTOSHOP, POSTSCRIPT, READER, and SHOCKWAVE. (*Id.* at ¶ 9.)

16   Defendants are Joshua Christenson and his now-defunct corporation, Software Surplus,

17   Inc., which was in the business of selling software products over the Internet through its

18   eponymous website www.softwaresurplus.com. Neither defendant is an authorized distributor of

19   Adobe software. Instead, Software Surplus purchased Adobe software from third parties and

20   advertised and sold it through its website without Adobe's permission.

21   On October 30, 2009, Adobe filed this action alleging two causes of action for copyright

22   and trademark infringement under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq.*, and the

23   Lanham Act, 15 U.S.C. § 1051, *et seq.* (Complaint (#32-2).)[2] Adobe alleges that Defendants have

24

25   [2] Adobe originally filed the action in the United States District Court for the Northen District
     of California. On Defendants' motion to transfer venue, the case was transferred to this district on
26   March 8, 2010 (#33).

made and distributed copies of Adobe's software without authorization or license, in violation of Adobe's exclusive copyrights of reproduction and distribution. (*Id.* at ¶ 16.) Adobe further alleges that Defendants' use of Adobe's trademarks in advertising and selling Adobe software has "confused and deceived . . . the consuming public concerning the source and sponsorship of the unauthorized copies of the Adobe Software offered, sold and distributed by Defendants." (*Id.* at ¶ 18; *see also id.* ¶¶ 25-26.)

On May 4, 2010, Defendants filed an Answer, Counterclaim, and Third-Party Complaint (#39), alleging counterclaims and third-party claims against Adobe and third-party defendant Software Publishers Association d/b/a Software & Information Industry Association ("SIIA"), the self-described "principal trade association for the software and digital content industry" (#87-6, p. 9). Defendants' claims include (1) defamation and defamation *per se*, (2) false light, (3) business disparagement, (4) aiding and abetting, (5) civil conspiracy, and (6) alter ego or instrumentality. The claims are based on a press-release issued by SIIA on November 12, 2009. Among other allegedly defamatory statements, the press release announced the filing of six "software piracy" lawsuits on Adobe's behalf against various online sellers of Adobe software, including Joshua Christensen and Softwaresurplus.com, and accused them of being "Software Pirates" and "Fraudulent Online Venders" who "swindled both consumers and Adobe by illegally copying or selling" Adobe's software and "knowingly engag[ed] in copyright infringement through the fraudulent sales of Adobe software." (Doc. #87-6, p. 8.)

Following discovery, on February 28, 2011, the parties simultaneously filed the instant cross-motions for summary adjudication and summary judgment. Adobe and SIIA jointly move for partial summary judgment as to liability (but not damages) on Adobe's copyright and trademark claims against Defendants and for summary judgment on all of Defendants' counterclaims and third-party claims (#87). Defendants move for summary judgment on Adobe's copyright and trademark claims, but not on their counterclaims and third-party claims (#88).

1    After the summary judgment motions were fully briefed, the Magistrate Judge entered two

2    orders significantly impacting the evidentiary record.  On May 31, 2011, the Magistrate Judge

3    entered an order (#144) granting Defendants' Motion to Preclude Adobe or SIIA's Use of or

4    Reliance on Contracts, Licenses or Agreements (#127).  Finding that Adobe had "failed to identify

5    contracts or license agreements in its Rule 26(a) disclosures," the court ordered that Adobe "is

6    precluded from using or introducing license agreements in support of its motion for summary

7    judgment or at trial" but "is not, however, precluded from using contracts, license agreements or

8    other documents produced by Defendants in Defendants' disclosures or responses to discovery

9    requests." (Order (#144), pp. 1-2.)  Then, on August 16, 2011, the Magistrate Judge entered a

10   second order (#149) denying Adobe's motion for clarification or reconsideration (#147).  Rejecting

11   Adobe's attempts to blunt the impact of the court's discovery sanction, the Magistrate Judge

12   clarified, "The ability of Plaintiff to use Defendants' documents is limited to those documents it

13   actually produced.  The Court never intended to permit Plaintiff to use other documents that are

14   'identified' or 'referenced' in Defendants' disclosures but were not actually produced." (Order

15   (#149), p. 4.)  The Magistrate Judge also rebuffed Adobe's arguments regarding the limited use of

16   precluded documents for illustrative purposes, finding it "unnecessary to include language in the

17   order instructing the district judge on the parameters of his discretion regarding the use of

18   precluded documents for illustrative as opposed to evidentiary purposes." (*Id.* at 3.)

19   Following the Magistrate Judge's orders, on August 23, 2011, Defendants filed the instant

20   Motion to Strike Precluded Documents and Related Factual Assertions and Argument (#150).  As

21   the motion to strike is targeted at Adobe and SIIA's summary judgment briefs and exhibits, the

22   court will address that motion before proceeding to the parties' cross-motions for summary

23   judgment.

24   **II.    Defendants' Motion to Strike**

25   It is well-established that a district court's inherent power to control its docket and to

26   enforce its rules "includes the power to strike items from the docket as a sanction for litigation

4

conduct." *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010).  Such power is indispensable to the court's ability to enforce its orders, manage its docket, and regulate insubordinate attorney conduct.  *See Mazzeo v. Gibbons*, 2010 WL 3910072, *3 (D. Nev. 2010).

In seeking to enforce the Magistrate Judge's order that Adobe "is precluded from using or introducing license agreements in support of its motion for summary judgment or at trial," Defendants move to strike from Adobe and SIIA's summary judgment briefs and exhibits all documents covered by the order, as well as all factual assertions, references and arguments that relate to Adobe's licensing agreements with its distributors and users.  The specific documents and passages sought to be stricken are identified in detail in Defendants' motion and reproduced in an exhibit to their reply brief.  (*See* Motion (#150), pp. 6-7; Reply (#153), Rasmussen Decl.)

Adobe and SIIA's opposition does not specifically address any of the documents or passages identified in Defendants' motion.  Instead, they argue generally that the Magistrate Judge's discovery orders did not preclude testimony from their declarants, who were identified in disclosures and may testify as competent witnesses based on their personal knowledge.  *See* Fed. R. Evid. 601-602.  It is also argued that even if the precluded licenses may not be used to establish the truth of their contents, the documents may be used for limited or illustrative purposes, including as exemplars to illustrate the testimony of witnesses concerning Adobe's licensing agreements.

The court finds that Adobe and SIIA's arguments miss the mark.  As will be seen, whether and on what terms Adobe licenses and restricts the distribution and use of its software products is central to the parties' summary judgment motions.  And under the best evidence rule, which Adobe and SIIA fail to address, the licenses themselves are required to prove their terms and, by extension, their legal effect.  *See* Fed. R. Evid. 1002.  It is therefore beside the point that exhibits omitted from pretrial disclosures might be admissible at trial, not to establish the truth of their contents, but for demonstrative or illustrative purposes in the court's discretion.  And it is beside the point that Adobe and SIIA's declarants are, as a general matter, competent witnesses.  Defendants' motion does not seek to entirely bar the testimony of the declarants, but only those portions of their

1   declarations that are offered to prove the terms and legal effect of Adobe's licensing

2   agreements—testimony which is inadmissible in the absence of those writings.

3       The court finds that the documentary and testimonial evidence identified in Defendants'

4   motion to strike is offered by Adobe and SIIA on the parties' cross-motions in order to prove the

5   terms and legal effect of Adobe's licensing agreements yet is inadmissible for that purpose under

6   the Magistrate Judge's discovery orders and the rules of evidence.  Defendants' motion to strike

7   shall therefore be granted, and the court will disregard the stricken materials for purposes of

8   resolving the parties' cross-motions for summary judgment.

9   **III.   Cross-Motions for Summary Judgment**

10      **A.  Copyright Infringement**

11      Adobe moves for summary adjudication as to liability on its claim for copyright

12  infringement, while reserving the issue of damages for jury resolution.  Adobe contends that it

13  owns valid copyrights in the software distributed by Defendants, that Defendants violated Adobe's

14  exclusive right of distribution by engaging in online sales of Adobe software without authorization

15  or license from Adobe.[3]  Adobe further contends that the first sale doctrine is inapplicable because

16  Adobe maintains exclusive distribution rights by only licensing and not selling its products, and

17  because some of the products at issue were manufactured outside the United States and not meant

18  for domestic distribution.  Adobe also contends that Defendants bear the burden of proof to

19  establish the applicability of the first sale doctrine as an affirmative defense.

20

21  _____

22      [3] Adobe alleges in its complaint that, in addition to distributing Adobe software, Defendants also "made" unauthorized copies in violation of Adobe's exclusive right of reproduction.  (Complaint (#1).

23  ¶¶ 3, 8, 16.)  Adobe does not address this aspect of its copyright infringement claim in its motion, nor does Adobe provide any evidence to support such a claim in opposition to Defendants' motion for summary judgment.  The court therefore finds that Adobe has abandoned the claim and will grant

24  Defendants' motion for summary judgment as to Adobe's claim of copyright infringement based on reproduction.  The court accordingly analyzes Adobe's copyright infringement claim solely as a

25  distribution claim.  *See*  17 U.S.C. § 106(1), (3) (separately providing for the rights of reproduction and

26  distribution).

6

1    Defendants cross-move for summary judgment.  Defendants do not contest that they

2 distributed Adobe software without Adobe's authorization, but they dispute Adobe's contentions as

3 to copyright ownership and the first sale doctrine.  Defendants contend that Adobe has failed to

4 produce any admissible evidence to establish ownership of valid copyrights because they failed to

5 timely produce any copyright certificates during discovery.  Defendants also contend that the first

6 sale doctrine applies to Defendants' purchases and resales of Adobe software because, given the

7 court's orders precluding Adobe from introducing its licensing agreements, Adobe cannot prove

8 that it licenses and does not sell its software products, and because Adobe has not established that

9 any of the Adobe software that Defendants sold was made outside the United States.  Defendants

10 contend that it is Adobe, not Defendants, that should bear the burden of proof, or at least the burden

11 of production, on the issues of licensing and origin and that Adobe has failed to carry that burden.

12    "Plaintiffs must satisfy two requirements to present a prima facie case of direct

13 infringement: (1) they must show ownership of the allegedly infringed material and (2) they must

14 demonstrate that the alleged infringers violated at least one exclusive right granted to copyright

15 holders under 17 U.S.C. § 106."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir.

16 2001).  The exclusive rights granted to copyright holders include the right of distribution.  *See* 17

17 U.S.C. § 106(3) ("to distribute copies or phonorecords of the copyrighted work to the public by sale

18 or other transfer of ownership, or by rental, lease or lending").  Even if these requirements are

19 satisfied, however, the defendant may avoid liability if its allegedly infringing activities fall within

20 an exception to § 106, including the first sale doctrine of § 109(a).

21    Section 109(a) codifies the first sale doctrine by providing, in pertinent part:

22 "Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord

23 lawfully made under this title, or any person authorized by such owner, is entitled, without the

24 authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or

25 phonorecord."  17 U.S.C. § 109(a).  The first sale doctrine thus significantly limits the exclusive

26 distribution right of the copyright owner "only to the first sale of the copyrighted work."  *Quality*

1  *King Distributors, Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135, 141 (1998) (citing *Bobbs-*

2  *Merrill Co. v. Struas*, 210 U.S. 339, 349-50 (1908)). "[O]nce the copyright owner places a

3  copyrighted item into the stream of commerce by selling it, he has exhausted his exclusive statutory

4  right to control its distribution." *Id.* at 152.

5       The first sale doctrine has two important limitations, however. First, the doctrine applies

6  only to the owner of a particular copy, not to a mere licensee authorized only to possess and use the

7  copy. *See* 17 U.S.C. § 109(d); *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010).

8  Whether a transferee obtains ownership or only a license is an issue of law. *See Krause v.*

9  *Titleserv, Inc.*, 402 F.3d 119, 124 (2d Cir. 2005). "[W]here a transferee receives a particular copy

10  of a copyrighted work pursuant to a written agreement, we consider all of the provisions of the

11  agreement to determine whether the transferee became an owner of the copy or received a license."

12  *Vernor*, 621 F.3d at 1109. "[A] software user is a licensee rather than an owner of a copy where the

13  copyright owner (1) specifies that the user is granted a license; (2) significantly restricts the user's

14  ability to transfer the software; and (3) imposes notable use restrictions." *Id.* at 1111.

15       The second limitation is that the first sale doctrine applies only to copies that were lawfully

16  made or sold in the United States, not to foreign-made copies not authorized for sale within the

17  United States. *See Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982, 985-86 (9th Cir. 2008).

18  Thus, the first sale doctrine protects domestic resales of U.S.-made copies, regardless of any

19  restrictions on domestic distribution—*e.g.*, even if the goods were authorized only for foreign

20  distribution, sold abroad, and re-imported without permission. *See id.* at 987 (discussing *Quality*

21  *King*'s application of the doctrine to unauthorized "round trip" importation). And the first sale

22  doctrine protects resales of copies that were not made in the United States but subject to a voluntary

23  or authorized domestic first sale. *See id.* at 986 (citing *Parfums Givenchy, Inc. v. Drug Emporium,*

24  *Inc.*, 38 F.3d 477, 481 (9th Cir. 1994), and *Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*, 84 F.3d

25  1143, 1149-50 (9th Cir. 1996)). The doctrine does *not* apply to foreign-made copies that are

26  authorized only for sale abroad and imported without permission. *See id.* at 985-86, 989-90 (citing

8

1   *BMG Music v. Perez*, 952 F.2d 318, 319 (9th Cir. 1991)).

2          The Ninth Circuit has not expressly addressed the issue of who bears the burden of proof

3   regarding the first sale doctrine in civil actions for copyright infringement.  The legislative history

4   suggests that the defendant bears the burden of at least proving "whether a particular copy was

5   lawfully made or acquired."  H.R. Rep. No. 94-1476, at 81 (1976), reprinted in 1976 U.S.C.C.A.N.

6   5659, 5695 ("Historical Note to § 109"), *cited in Am. Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661,

7   663 n.1 (5th Cir. 1978), *and Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F. Supp.

8   208, 212 (E.D.N.Y. 1994).  This is based on "the established legal principle that the burden of

9   proof should not be placed upon a litigant to establish facts particularly within the knowledge of his

10  adversary."  Historical Note to § 109.  Accordingly, because the defendant "clearly has the

11  particular knowledge of how possession of the particular copy was acquired," he "should have the

12  burden of providing this evidence to the court."  *Id.*  Nonetheless, a defendant's production of

13  evidence that the plaintiff made first sales of the copies in question, or that the defendant acquired

14  his copies from a legitimate source, can shift the burden of production to the plaintiff to trace title

15  backward to an illegitimate acquisition.  *Foreman*, 576 F.2d at 665.

16          Here, it is uncontroverted that Defendants lawfully purchased genuine copies of Adobe

17  software from third-party suppliers before reselling those copies.  This case is therefore unlike

18  *Foreman*, in which the defendant failed to produce any evidence as to how its particular copies

19  were made or acquired.  576 F.2d at 664.  Here, Defendants have identified their suppliers and

20  Adobe makes no contention that Defendants' acquisition of any copies of Adobe software was

21  unlawful or that the copies were anything other than genuine Adobe-manufactured products.  Thus,

22  the uncontroverted evidence before the court is that the particular copies at issue were lawfully

23  "made [and] acquired."  Historical Note § 109.  The only issue before the court is whether

24  Defendants' distribution of the particular copies of Adobe software that it lawfully purchased was

25  not protected by the first sale doctrine under either the licensing or origin exceptions.

26  ///

1   Adobe principally contends that none of the copies that Defendants sold are protected by the

2   first sale doctrine because it only licenses and does not sell copies of its software.  As Defendants

3   contend, however, there is no admissible evidence in the record to support Adobe's argument.  Any

4   such restrictions on alienation would be set forth in a written licensing agreement, yet Adobe is

5   precluded in this litigation from introducing such agreements due to its failure to produce them in

6   discovery.  The production of the licenses is necessary for this court to determine whether Adobe as

7   the copyright holder has included the requisite specifications and restrictions on transfer and use

8   such that the transferee has been granted only a license.  In the absence of those licenses, the

9   analysis required by *Vernor*—considering "all the provisions of the agreement" to determine

10  whether the copyright owner has specified that the user is only granted a license and imposed

11  significant restrictions on transfer and use—is impossible.  *See Vernor*, 621 F.3d at 1109, 1111; *see*

12  *also id.* at 1113 (holding "that a software customer *bound by a restrictive license agreement* may be

13  a licensee of a copy not entitled to the first sale doctrine") (emphasis added).

14  The burden is properly placed on Adobe to produce evidence that it merely licenses and

15  does not sell the genuine software products that Defendants lawfully acquired and resold.  The

16  *Vernor* requirements are all phrased in the affirmative.  A transferee is a mere licensee rather than

17  an owner only if the copyright holder affirmatively "(1) *specifies* that the user is granted a license;

18  (2) significantly *restricts* the user's ability to transfer the software; and (3) *imposes* notable use

19  restrictions."  *Id.* at 1111 (emphasis added); *see also id.* at 1112 (concluding that transferees were

20  licensees rather than owners "because Autodesk reserved title . . . and imposed significant transfer

21  and use restrictions").  Furthermore, just as the burden may be properly placed upon the defendant

22  regarding the lawfulness of its acquisition of a copyrighted work because how it acquired

23  possession is particularly within the defendant's knowledge, *see* Historical Note to § 109, the

24  copyright holder should bear the burden of producing evidence to establish that it retains title in and

25  only licenses the copies it sells because any restrictions on ownership, transfer and use

26  affirmatively imposed by the copyright holder in its dealings with its distributors are particularly

1  within the copyright holder's knowledge.  Indeed, Adobe agrees that "'Adobe and Adobe alone

2  knows the parties with whom it contracts, and . . . the terms of those contracts.'"  (Adobe's Reply

3  (#129), p. 6:21-22 (quoting Defendants' Opposition (#113), p. 17:12-13).)  It therefore should bear

4  the burden of producing evidence that its sales to distributors and users were governed by

5  restrictive licensing agreements making them and subsequent transferees mere licensees rather than

6  owners.

7        Adobe also invokes the second limitation on the first sale doctrine, contending that the

8  doctrine is inapplicable because "[a]t least some of Defendants [sic] products were not made in the

9  United States and were never meant for the United States market."  (Adobe's Motion (#87), pp. 10-

10  11.)  The court rejects this argument as well.  The argument as presented by Adobe is expressly

11  limited in application to only "some" of the copies sold by Defendants.  (*Id.*)  And Adobe fails to

12  specify which copies of its software that Defendants sold were not made in the United States and

13  not authorized for import.  "In copyright law, . . . each copyrighted item is unique[,]" and "for

14  purposes of the first sale doctrine, each copy is unique."  *Foreman*, 576 F.2d at 666.  Only a single

15  copy sold by the Defendants is specifically addressed—a copy sold to one Shelley Bernd.  But as to

16  that copy, Adobe's evidence addresses only where the software was authorized for distribution, not

17  where it was made.  Such evidence is insufficient to defeat application of the first sale doctrine,

18  which applies even to unauthorized "round trip" imports.  *See Omega*, 541 F.3d at 987.

19        For these reasons, the court finds that on this evidentiary record there is no genuine issue of

20  material fact on the applicability of the first sale doctrine to Defendants' resales of Adobe software

21  for purposes of Adobe's claim of copyright infringement.  Defendants are therefore entitled to

22  summary judgment on that claim.

23        **B.  Trademark Infringement**

24        Adobe also moves for summary adjudication as to liability on its claim for trademark

25  infringement.  Adobe contends that it owns valid, registered trademarks and that Defendants' use of

26  Adobe's trademarks in the course of advertising and selling Adobe software has caused actual

confusion, or at least a likelihood of confusion under the *Sleekcraft* balancing test.[4]  *See* 15 U.S.C.
§ 1114(1); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-54 (9th Cir. 1979).

Defendants cross-move for summary judgment.  Defendants contend that Adobe has failed
to produce any admissible evidence to establish trademark ownership because they failed to timely
produce valid trademark certificates.  Defendants also contend that the nominative fair use doctrine
applies here because any Adobe trademarks were used only to refer to the trademarked goods and
Adobe cannot show consumer confusion under the *New Kids* three-factor test.  *New Kids on the
Block v. News Am. Publishing, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

Section 32 of the Lanham Act prohibits any person, without the consent of the registered
owner of a trademark, from using "any reproduction, counterfeit, copy, or colorable imitation of a
registered mark in connection with the sale, offering for sale, distribution, or advertising of any
goods or services" in such a way that "is likely to cause confusion, or to cause mistake, or to
deceive." 15 U.S.C. § 1114.  To prevail on such a trademark infringement claim, the registrant
must show (1) ownership of a valid, protectable trademark, and (2) that the defendant's use of the
mark is likely to cause confusion.  *See Applied Information Sciences Corp. v. eBay, Inc.*, 511 F.3d
966, 969 (9th Cir. 2007).

Although likelihood of confusion is ordinarily assessed under the *Sleekcraft* eight-factor
balancing test, "the *Sleekcraft* analysis doesn't apply where a defendant uses the mark to refer to

---

[4]Adobe also moves for summary adjudication on a claim of false advertising under
section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  The court summarily rejects this argument,
however, because the claim appears nowhere in the complaint.  Adobe's complaint makes no mention
of false advertising.  Nor do its allegations suggest such a claim.  In Adobe's motion for summary
judgment, the claim is predicated on Defendants' alleged misrepresentations regarding the features or
versions of Adobe software.  (*See* Motion (#87), pp. 16-17.)  Adobe included no such allegations in
the complaint, instead predicating its trademark infringement claim solely upon Defendants' alleged
"use [of] images confusingly similar or identical to Adobe's Trademarks" and upon alleged confusion
or deception "concerning . . . source and sponsorship" or "affiliation, sponsorship, endorsement or
approval."  (Complaint (#32-2), ¶¶ 17-18, 25.)  Adobe's motion for summary adjudication shall
therefore be denied as to this non-existent claim.

1   the trademarked good itself." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th

2   Cir. 2010). "[S]uch use of the trademark is . . . nominative fair use," which is "by definition, not

3   infringement." *Id.*  In nominative fair use cases, the court applies a different test to evaluate the

4   likelihood of confusion, which "replaces" the *Sleekraft* analysis.  *Id.* at 1175-76, 1182.  The court

5   asks whether (1) the product in question is "readily identifiable without use of the trademark," (2)

6   the defendant used more of the mark than is "reasonably necessary" to identify the product, and (3)

7   the defendant falsely suggested sponsorship or endorsement by the trademark holder.  *New Kids*,

8   971 F.2d at 308.  In performing this analysis, the court's focus is on the "reasonably prudent

9   consumer in the marketplace," which in this case is "a reasonably prudent consumer accustomed to

10  shopping online." *Toyota*, 610 F.3d at 1176 (internal quotation marks and citation omitted).

11         A defendant asserting nominative fair use as a defense "need only show that it used the

12  mark to refer to the trademarked good" in order to shift the burden to the plaintiff to show a

13  likelihood of confusion.  *Id.* at 1183.  Then, the trademark holder "must bear the burden of

14  establishing that the [defendant's] use of [its] mark was *not* nominative fair use." *Id.* at 1182.  This

15  is because "[a] finding of nominative fair use is a finding that the plaintiff has failed to show a

16  likelihood of confusion as to sponsorship or endorsement," and the burden of proving likelihood of

17  infringement is always on the party charging infringement.  *Id.* at 1182-83 (citing *KP Permanent*

18  *Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004)).

19         Here, even assuming *arguendo* that Adobe has produced admissible evidence of valid

20  trademarks, the court finds that Adobe has failed to produce evidence creating a genuine issue of

21  material fact as to nominative fair use.  The uncontroverted evidence is that Defendants used

22  Adobe's marks to refer to the Adobe software that it advertised and sold on the website

23  softwaresurplus.com, thus placing the burden on Adobe to establish likelihood of confusion by

24  negating nominative fair use, which it has failed to do.

25         Adobe's contention that Defendants could have identified the product using only some of its

26  marks and without using others is unavailing.  The use of a trademark need not be absolutely

1   necessary.  *Toyota*, 610 F.3d at 1180 (declining to adopt a "draconian definition of necessity").  It is

2   sufficient that the defendants "needed to communicate" that they were offering Adobe software for

3   sale and that using Adobe's marks accomplished this goal.  *Toyota*, 610 F.3d at 1180.  Nor did

4   Defendants' use imply sponsorship or endorsement to a reasonably prudent consumer in the online

5   marketplace.  Indeed, the very domain name—softwaresurplus.com—from which Defendants sold

6   Adobe software would notify a reasonably prudent online consumer that Defendants were merely

7   resellers of "surplus" software.  *See id.* at 1180 (finding that reasonable consumers arriving at the

8   sites "buy-a-lexus.com" and "buyorleaselexus.com" would not be confused as to sponsorship or

9   endorsement given the content of the websites).

10          The court also rejects Adobe's argument that the nominative fair use doctrine is

11   inapplicable because Defendants made misrepresentations regarding the versions or features of the

12   Adobe software offered for sale.  Adobe is mixing claims.  While the alleged misrepresentations

13   might support a claim for false advertising, Adobe failed to allege any such claim in the complaint.

14   *See supra* footnote 4.  And such issues are distinct from the nominative fair use doctrine, which is

15   concerned with whether the "use *of the mark* will inspire a mistaken belief on the part of the

16   consumers that the speaker is *sponsored or endorsed* by the trademark holder."  *Toyota*, 610 F.3d at

17   1176 (emphasis added); *see also Am. Circuit Breaker Corp. v. Oregon Breakers Inc.*, 406 F.3d 577,

18   584-85 (9th Cir. 2005) (sale of genuine grey market goods under true mark was not infringing

19   because there was no likelihood of confusion "as to source"); *NEC Electronics v. CAL Circuit*

20   *Abco*, 810 F.2d 1506, 1508-09 (9th Cir. 1987) (concluding that trademark law does not apply to

21   resales of "genuine goods bearing a true mark," even though the products were "grey market"

22   goods sold "without the mark owner's consent" and "some purchasers mistakenly thought their

23   chips were protected by [the mark owner's] servicing and warranties").  Adobe has not alleged that

24   Defendants used its marks to falsely identify the origin or make of Adobe software, and it has failed

25   to produce evidence that the use of its marks created any likelihood of confusion regarding

26   sponsorship or endorsement.

1    For these reasons, the court finds that there is no genuine issue of material fact that

2    Defendants' use of Adobe's marks in the advertisement and sale of Adobe software constituted

3    nominative fair use. Defendants are therefore entitled to summary judgment on Adobe's claim for

4    trademark infringement.

5         **C. Counterclaims**

6         Adobe and third-party defendant SIIA jointly move for summary judgment on Defendants'

7    counterclaims and third-party claims for (1) defamation and defamation *per se*, (2) false light, (3)

8    business disparagement, (4) aiding and abetting, (5) civil conspiracy, and (6) alter ego or

9    instrumentality. The claims are based on a press release issued by SIIA on November 12, 2009,

10   announcing that SIIA had investigated and filed six "software piracy" lawsuits "[o]n behalf of SIIA

11   member Adobe Systems Incorporated" against various online sellers, including Joshua Christensen

12   and Softwaresurplus.com. The press release further characterized the various defendants as

13   "Fraudulent Online Vendors" and "Software Pirates," stated that they "either sold infringing copies,

14   including counterfeit versions, or illegally sold educational and OEM versions without

15   authorization," stated that they were charged in the lawsuits with "knowingly engaging in copyright

16   infringement through the fraudulent sale of Adobe Software," and quoted an SIIA officer's

17   statements that the defendants "'have swindled both consumers and Adobe by illegally copying or

18   selling well-known Adobe software products.'" (Doc. #87-6, p. 8.)

19        Adobe and SIIA move for summary judgment on four grounds: first, the statements were

20   truthful or opinions; second, the statements are privileged; third, defendants suffered no cognizable

21   injury caused by the press release; and fourth, Adobe cannot be held liable because it did not draft

22   or publish the press release. The court will address each in turn.

23        **1.    True Statements and Opinions**

24        Adobe and SIIA first contend that the statements in the press release were in fact true, thus

25   defeating the element of falsity for each of Defendants' claims for defamation, false light, and

26   business disparagement. *See Nev. Indep. Broad. Corp. v. Allen*, 664 P.2d 337, 343 (Nev. 1983)

1    (defamation); *Flowers v. Carville*, 310 F.3d 1118, 1132 (9th Cir. 2002) ("False light, like

2    defamation, requires at least an implicit false statement of objective fact."); *Cal. Scents v. Curco*

3    *Prods., Inc.*, 406 F.3d 1102, 1109 (9th Cir. 2002) (common law product disparagement).  There are

4    two fundamental problems with Adobe and SIIA's arguments, however.

5            First, Adobe and SIIA's arguments to establish the truth of their statements regarding the

6    illegal, unauthorized and infringing nature of Defendants' sales of Adobe software are derivative of

7    their arguments on the merits of their infringement claims.  Given the court's rulings rejecting

8    those arguments and granting summary judgment to Defendants on those claims, Adobe and SIIA's

9    attempt to rely on those same arguments to establish that the accusations in the press release were

10   in fact true is untenable.

11           Second, Adobe and SIIA also single out several factual statements in the two-page press

12   release that are objectively true, such as that lawsuits were in fact filed and background information

13   not directly related to Defendants or their alleged misconduct.  That some of the multitude of

14   statements in the press release are factual and even innocuous is beside the point, however, as

15   Defendants' claims are plainly directed elsewhere.

16           Adobe and SIIA also contend that some of the allegedly defamatory statements were non-

17   actionable statements of opinion.  *See Allen*, 664 P.2d at 341-42.  They specifically point to the

18   statements in the press release that Defendants have "swindled both consumers and Adobe by

19   illegally copying or selling well-known Adobe software products," and that "Software that seems

20   too cheap to be legitimate probably is not."  (Motion (#87), p. 27.)

21           The court rejects the argument that the first statement is merely an opinion.  A reasonable

22   person surely "would be likely to understand the remark . . . as a statement of existing fact" rather

23   than merely "as an expression of the source's opinion." *Allen*, 664 P.2d at 342.  And even if the

24   statement were ambiguous, it must be left for the jury to decide whether it is a statement of fact or

25   opinion, precluding summary judgment.  *See id.*  Likewise, the second statement, when read in

26   conjunction with other statements in the press release concerning Defendants' allegedly infringing

1   and fraudulent activities, could be understood as an implicit false statement of objective fact that

2   the products Defendants sold were not legitimate.  And in any event, as noted above, even if this

3   singular statement in the press release were a non-actionable statement of opinion, summary

4   judgment is inappropriate on Defendants' claims, which are adequately supported by several other

5   statements of fact.

6                   **2.      Privilege**

7                   Adobe and SIIA next contend that their allegedly defamatory statements were qualified or

8   conditionally privileged as statements made in good faith on a subject matter in which they had an

9   interest.  Under Nevada law, "[a] qualified or conditional privilege exists where a defamatory

10  statement is made in good faith on any subject matter in which the person communicating has an

11  interest, or in reference to which he has a right or a duty, if it is made to a person with a

12  corresponding interest or duty." *Circus Circus Hotels, Inc. v. Witherspoon*, 657 P.2d 101, 105

13  (Nev. 1983).  "Whether a particular communication is conditionally privileged by being published

14  on a 'privileged occasion' is a question of law for the court; the burden then shifts to the plaintiff to

15  prove to the jury's satisfaction that the defendant abused the privilege by publishing the

16  communication with malice in fact." *Id.* (citations omitted).

17                  Here, even if Adobe and SIIA could establish that they made the allegedly defamatory

18  statements in good faith and that they had an interest in the subject matter, they make no contention

19  or showing whatsoever that the statements were made to a person with a corresponding interest or

20  duty, which is a necessary element of the qualified or conditional privilege. *See id.* at 105 & n.3

21  (finding that a former employer's statements about the character or conduct of former employees to

22  present or prospective employers are protected by a qualified or conditional privilege because "they

23  have a common interest in the subject matter of the statements").  Adobe and SIIA make no

24  mention or showing as to the identities or common interests of the recipients of their

25  communication.  Indeed, it would be difficult, if not impossible, to do so, as the communication

26  here was a press release posted on the internet for widespread dissemination.  The court therefore

finds that Adobe and SIIA have failed to establish the absence of a genuine issue of material fact as to each element of the qualified or conditional privilege, precluding summary judgment.

Adobe and SIIA also contend that the statements in the press release are protected by the so-called "litigation privilege," citing California cases applying the privilege to out-of-court news releases announcing the filing of lawsuits. *See, e.g., eCash Techs., Inc. v. Guagliardo*, 127 F. Supp. 2d 1069, 1082 (C.D. Cal. 2000). The court rejects this argument. Even under California law,[5] the litigation privilege does not apply on these facts. The cited cases stand only for the proposition that press releases "*merely* informing a third party of the *pendency* of [the] litigation" are privileged. *Id.* (initial emphasis added) ("The letter merely states what is clearly true, that litigation regarding Plaintiff's and Defendants' rights to the 'eCash' mark was at the time ongoing in federal court."); *see also Microsoft Corp. v. Yokohama Telecom Corp.*, 993 F. Supp. 782, 784 (C.D. Cal. 1998) (holding that the privilege applies to a press release that "captures the substance of, and does not deviate from, the allegations in [the] Complaint"). Here, while the press release at issue did announce the filing and subject matter of the lawsuit filed against Defendants, it also plainly went beyond merely reporting on the lawsuit and its allegations by directly accusing Defendants of "swindl[ing]" consumers and engaging in "fraudulent" sales and by characterizing them as "Software Pirates" and "Fraudulent Online Vendors." Notwithstanding the similarity of subject matter, such "litigating in the press" that bears no "functional" connection to the litigation is not immune, even under California's expansive litigation privilege. *Rothman v. Jackson*, 57 Cal. Rptr. 2d 284, 292-94 (Cal. Ct. App. 1996); *accord Rodriguez v. Panayiotou*, 314 F.3d 979, 988 (9th Cir. 2002).

///

---

[5] The parties do not address whether there are any material differences between the ligitation privilege under Nevada law and that under California law, which is based on a statute that California courts have construed expansively. *See* Cal. Civ. Code § 47(d); *Rubin v. Green*, 847 P.2d 1044, 1194 (Cal. 1993).

### 3.    Injury

In a footnote, Adobe and SIIA contend that even if the statements in the press release are actionable, Defendants are entitled to no recourse. (Motion (#87), p. 20 n.5.)  They argue in progressive fashion that, first, NRS § 41.336 limits the available recovery to only special damages[6] because no correction was demanded, and second, there is no evidence that the allegedly defamatory statements in the press release caused any special damages.  Instead, they contend Defendants' suppliers stopped doing business with them because of the litigation, not because of any defamatory statements in the press release.

The court rejects both arguments.  First, NRS § 41.336 is inapplicable here because the requirement that a correction be demanded expressly applies only to "the publication of a libel in a newspaper, or of a slander by radio or television broadcast," neither of which occurred here.  This case involves the issuance of a press release by non-media entities for widespread dissemination over the internet, and Defendants have sued the sources of the communication, not the media outlets that reported on the story.  Neither Adobe nor SIIA is a newspaper publisher or radio or television broadcaster, and the statute, enacted in 1969 and last amended in 1975, neither addresses in its text nor could contemplate a non-media entity's dissemination of information over the World Wide Web.  Defendants are therefore not statutorily limited to special damages.

Second, proof of special damages is not required for Defendants to proceed on their claims.  The allegedly defamatory statements at issue regarding Defendants' alleged involvement in software piracy constitute imputations that would injure their trade or business and, thus, are considered defamatory *per se* and actionable without proof of special harm.  *See Branda v. Sanford*, 637 P.2d 1223, 1225 (Nev. 1981); Restatement (Second) of Torts §§ 570, 573.

---

[6]Special damages compensate for "the loss of something having economic or pecuniary value." Restatement (Second) of Torts § 575, cmt. b.  By contrast, general damages compensate for harm to reputation.  *Id.* § 621, cmt. a.  Other damages may also be recoverable, including nominal damages, *id.* § 620, and emotional distress and resulting bodily harm, *id.* § 623.

### 4.   Adobe's liability

Finally, Adobe and SIIA contend that even if Defendants' claims can go forward against SIIA, Adobe cannot be held liable for statements in a press release that it did not draft or publish. Adobe submits that SIIA independently developed the concept for, drafted, approved and published the press release, that it contains no statements by Adobe or its personnel, and that there is no evidence to support Defendants' claims that Adobe is liable as an aider and abettor, co-conspirator, or alter ego of SIIA.

On this record, the court finds that disputed issues of material fact preclude summary judgment for Adobe.  Although this lawsuit was filed in Adobe's name, the press release issued two weeks later states that SIIA acted "[o]n behalf of SIIA member Adobe Systems Incorporated" in "investigat[ing] and fil[ing]" this lawsuit and five others.  The press release and other evidence in the record further establishes that SIIA's representation of Adobe's interests is not unique to this lawsuit, in that SIIA regularly acts on behalf of Adobe in the investigating and filing of lawsuits against alleged infringers.  Construed in the light most favorable to Defendants, it is a reasonable inference that SIIA acted as Adobe's investigator, prosecutor and spokesperson.  Also, Adobe's blanket denial of any active participation regarding the press release is belied by its own evidence, which establishes that the press release was sent to Adobe for review before being issued and that SIIA and its public relations firm may have made revisions in response to feedback from Adobe. (*See* Bain. Decl. (#87-5), p. 5, ¶ 10.)  That SIIA may have been the lead actor in drafting and issuing the press release does not preclude material participation by Adobe, even if behind-the-scenes, or a finding that Adobe and SIIA acted with a unity of purpose, common design or meeting of the minds to publish the allegedly defamatory statements. *See Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir. 1990).

For all these reasons, Adobe and SIIA's motion for summary judgment as to Defendants' counterclaims and third-party claims shall be denied.

IV.   **Conclusion**

In summary, the court concludes that Defendants' motion to strike should be granted, that Defendants are entitled to summary judgment on Adobe's claims for copyright and trademark infringement, and that Adobe and SIIA are not entitled to summary judgment on Defendants' counterclaims and third-party claims, which shall go forward.

IT IS THEREFORE ORDERED that Defendants' Motion to Strike Precluded Documents and Related Factual Assertions and Argument (#150) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff and Third-Party Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims and for Summary Judgment on Defendants' Counterclaims and Third-Party Claims (#87) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (#88) on Plaintiff's complaint for copyright and trademark infringement is GRANTED.

IT IS FURTHER ORDERED that the parties shall lodge their proposed joint pretrial order within thirty (30) days from entry of this Order.  *See* Local Rule 16-4 and 26-1(e)(5).

IT IS SO ORDERED.

DATED this 10th day of September, 2012.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE